**IN RE: Joseph J. MOCELLA and Kimberly A. Mocella, Debtors.**

**CASE NUMBER 10–42287**

United States Bankruptcy Court, N.D. Ohio.

Signed June 15, 2016

*Id.* at 2.

Philip D. Zuzolo, Zuzolo Law Offices, LLC, Niles, OH, for Debtors.

## MEMORANDUM OPINION REGARDING DEBTORS' MOTION FOR CONTEMPT AGAINST NATIONSTAR

Kay Woods, United States Bankruptcy Judge

Before the Court is Motion for Contempt Against Nationstar Mortgage, LLC ("Motion for Contempt") (Doc. 147) filed by Debtors Joseph J. Mocella and Kimberly A. Mocella on October 27, 2015. On February 25, 2016, Nationstar Mortgage LLC ("Nationstar") filed Nationstar Mortgage LLC's Objection to the Debtors' Motion for Contempt ("Response") (Doc. 170). On April 27, 2016, the parties filed Proposed Stipulations of Nationstar Mortgage LLC and the Debtors with Respect to the Debtors' Motion for Contempt ("Stipulations") (Doc. 187), which consists of 24 paragraphs setting forth facts to which the parties have stipulated.

The Court held an evidentiary hearing on the Motion for Contempt on April 28, 2016 ("Hearing"). The Debtors were represented by Philip D. Zuzolo, Esq. and Nationstar was represented by Jeremy M. Campana, Esq. The Court received testimony from (i) Mr. Mocella; and (ii) Edward Hyne, Litigation Resolution Analyst for Nationstar. Admitted into evidence, without objection, were Debtors' Exhibits 1, 3, 4, 5, 9, 10, 11, 12, and 13 and Nationstar's Exhibit B. The Court took judicial notice of Debtors' Exhibits 2 and 6.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and General Order No.2012-7 entered in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408, and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of

law pursuant to Federal Rule of Bankruptcy Procedure 7052.

For the reasons set forth herein, the Court finds that Nationstar willfully violated the automatic stay in 11 U.S.C. § 362(a)(3) and that, pursuant to 11 U.S.C. § 362(k)(1), the Debtors are entitled to actual damages in the amount of $17,755.00, plus punitive damages in the amount of $250,000.00, for a total of $267,755.00. The Court will grant the Motion for Contempt.

## I. FACTUAL BACKGROUND

The following facts are based on the record in this case, including the parties' pleadings, the Stipulations, testimony received at the Hearing, and exhibits admitted into evidence. In addition to the Stipulations, at the beginning of the Hearing, the parties stipulated to the following facts: (i) the automatic stay in 11 U.S.C. § 362 was in place on December 4, 2014; (ii) Nationstar had actual notice of the Debtors' bankruptcy case since at least June 25, 2010 when Nationstar filed its first Request for Service of Notice (Doc. 16); and (iii) Nationstar's filing of the Claim Transfer (as defined *infra* on page 5) was an intentional act.

The Debtors filed a voluntary petition pursuant to chapter 13 of the Bankruptcy Code on June 18, 2010. The Debtors listed a 2008 Chevrolet Aveo ("Car") on Schedule B as being jointly owned and having a then-current value of $6,425.00. (Doc. 1 at 13.) On Schedule D, the Debt-

ors listed GMAC as having a claim in the amount of $10,815.31 secured by the Car. (*Id.* at 15.)

On June 23, 2010, GMAC timely filed a proof of claim, which was denominated Claim No. 2–1 ("Claim 2").[1] GMAC asserted that its claim in the amount of $10,925.40 with 10.75% interest is secured by the Car.[2] The last four digits of the account number listed on Claim 2 are 1280. Attached to Claim 2 are: (i) the Retail Instalment Sale Contract for the Car; and (ii) the Ohio Certificate of Title for the Car listing GMAC as the first lienholder.

On October 6, 2010, "Nationstar Mortgage" filed a proof of claim, which was denominated Claim No. 19–1 ("Claim 19").[3] Nationstar asserted a claim in the amount of $76,885.15 secured by the Debtors' residence located at 415 Kenmore Avenue Southeast, Warren, Ohio 44483. The last four digits of the account number listed on Claim 19 are 8739. Attached to Claim 19 are a Note and Mortgage, which indicate that GMAC Mortgage Corporation d/b/a ditech.com ("GMAC Mortgage") has a security interest in the Debtors' residence.

Prior to the petition date, on February 12, 2010, the Debtors obtained a HomeSaver Advance loan ("HomeSaver Loan") from Nationstar. The HomeSaver Loan was in the amount of $3,027.86 with 4.61% annual interest. The HomeSaver Advance Truth-in-Lending Disclosure Statement and Promissory Note was admitted into evidence as Debtors' Exhibit 3. While the HomeSaver Loan was not secured by real

---

1. Claim 2 was admitted into evidence as Debtors' Exhibit 1.

2. On August 24, 2010, the Debtors filed Objection to Claim Filed by GMAC (Doc. 22), in which the Debtors objected to Claim 2 on the basis that the interest rate of 10.75% was excessive and should be reduced to 5.25%. On September 27, 2010, the Court entered Order Disallowing Proof of Claim Filed by GMAC

(Doc. 26), which granted the relief requested by the Debtors. Accordingly, Claim 2 was allowed as a secured claim in the amount of $10,925.40 with 5.25% interest.

3. The Court took judicial notice of Claim 19 as Debtors' Exhibit 2, and Claim 19 was admitted into evidence as Nationstar's Exhibit B.

property, the caption of the HomeSaver Loan identified the "Property Address" as the Debtors' residence.

On December 4, 2014, Nationstar filed Transfer of Claim Other than for Security ("Claim Transfer") (Doc. 86),[4] in which Nationstar asserted that GMAC, as the transferor, had transferred Claim 2 in the amount of $10,925.40, filed on June 23, 2010, to Nationstar. Nationstar incorrectly listed the last four digits of the account number on Claim 2 as 5492. Nationstar listed the last four digits of the account number for the transferred Claim 2 as 3016. The Claim Transfer stated that transferee payments should be sent to 350 Highland Drive, Lewisville, TX 75067 ("Street Address"). The Claim Transfer was dated December 4, 2014, signed by Megan Koza, Assistant Secretary, and filed by Michael Daniels (no title listed). At the bottom of the Claim Transfer is the legend, "Penalty for making a false statement: Fine of up to $500, 000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571." (Claim Transfer at 1.)

Despite filing the Claim Transfer, however, Nationstar was not the transferee of Claim 2 because GMAC had never transferred Claim 2 to Nationstar. Instead, Nationstar explains its erroneous filing of the Claim Transfer as follows:

> On or about April 15, 2005, the Mocellas received a 30 year note (the *"Note"*) in the amount of $78,500 from [GMAC Mortgage]. The Mocellas also signed a mortgage (the *"Mortgage"*) to secure the Note. . . . The Note and Mortgage

were assigned to Nationstar July 13, 2010.

> On or about October 1, 2014, Nationstar received a servicing transfer from Ocwen Loan Servicing, LLC (*"Ocwen"*) of a loan with a balance of $2,380.52 which represented the balance of the [ (HomeSaver Loan) ] provided to the Mocellas by Nationstar on or about February 12, 2010. Ocwen did not file a proof of claim for this Loan. In light of the fact that the Mocellas' original Note was with [GMAC Mortgage], and not finding the Ocwen claim to transfer, on December 4, 2014, Nationstar incorrectly filed a transfer of claim with respect to the Mocellas' GMAC car loan (Doc. 86).

(Resp. at 2.)[5] Mr. Hyne testified that the above-referenced servicing transfer was a bulk transfer of 11,007 residential mortgage loans.[6]

Michael A. Gallo is the Standing Chapter 13 Trustee ("Trustee") in this case. Until Nationstar filed the Claim Transfer, the Trustee made payments to GMAC on Claim 2. After the Claim Transfer was filed, the Trustee made three payments to Nationstar at the Street Address set forth in the Claim Transfer, as follows: (i) $225.00 on December 23, 2014; (ii) $18.49 on January 23, 2015; and (iii) $54.23 on February 27, 2015. As a consequence, Nationstar received a total of $297.72 (collectively, "Claim Payments") from the Trustee as distributions on Claim 2. (Stips. ¶ 8.)

---

4. The Claim Transfer was admitted into evidence as Debtors' Exhibit 5.

5. The Court will utilize the definitions set forth in the above-quoted portion of the Response.

6. The HomeSaver Loan is a wholly separate loan from the Note and Mortgage for which Nationstar had filed Claim 19. (*See* pages 4–

5, *supra*.) The HomeSaver Loan was provided to the Debtors by Nationstar on February 12, 2010, and Ocwen transferred servicing of the HomeSaver Loan to Nationstar on October 1, 2014 as part of the bulk transfer. (Debtors' Ex. 3; Resp. at 2.) The record does not reflect when Nationstar transferred servicing of the HomeSaver Loan to Ocwen.

Nationstar filed Notice of Change of Address ("Address Change") (Doc. 93) on March 30, 2015, which changed Nationstar's address for account number 3016—the account number assigned to the transferred Claim 2 by Nationstar in the Claim Transfer—to P.O. Box 619096, Dallas, TX 75261–9741 ("P.O. Box Address").[7] The Address Change was served upon the Trustee, the Debtors, and Mr. Zuzolo.

On May 19, 2015—more than five months after filing the Claim Transfer—Nationstar filed Notice of Withdrawal of Transfer of Claim (Claim 2, Doc. 86) ("Notice of Withdrawal") (Doc. 110).[8] The Notice of Withdrawal was signed by Michael Daniels, Assistant Vice President Bankruptcy for Nationstar, and sets forth the P.O. Box Address for Mr. Daniels, which differs from the Street Address on the Claim Transfer.

Mr. Hyne testified that Nationstar filed the Notice of Withdrawal after realizing that the HomeSaver Loan was not a secured debt. Mr. Hyne further testified that, at that time, Nationstar examined the HomeSaver Loan account and did not find any payments received from the Trustee. Thus, Nationstar made the "assumption" that it had not received any payments from the Trustee as a result of the Claim Transfer.

After the Notice of Withdrawal was filed, the Trustee sent Nationstar two letters, in May and September 2015, each requesting the return of the Claim Payments that Nationstar had received.[9] (*Id.* ¶¶ 11–12.) Each of these letters was addressed to Nationstar at the Street Address rather than the P.O. Box Address. Mr. Hyne testified that, despite having a forwarding directive with the United States Postal Service at that time, Nationstar did not receive these letters. The two letters were not returned to the Trustee as undeliverable. (*Id.* ¶ 20.)

Despite filing the Notice of Withdrawal on May 19, 2015, Nationstar took no action to return the Claim Payments to the Trustee for more than five months. On October 27, 2015 (the date the Motion for Contempt was filed), the Trustee's office spoke by telephone with Mr. Daniels and requested the return of the Claim Payments.[10] (*Id.* ¶¶ 16–17.) Mr. Hyne testified that, until that time, Nationstar was unaware that it had received the Claim Payments because Nationstar had posted the Claim Payments to the Debtors' Mortgage account, rather than the HomeSaver Loan account for which it had wrongfully filed the Claim Transfer. Ten days later, on November 6, 2015, the Trustee received monies from Nationstar equal to the amount of the Claim Payments. (*Id.* ¶ 18.)

The Debtors made all payments concerning Claim 2 in accordance with their chapter 13 plan. (*Id.* ¶ 21.) But for Nationstar filing the Claim Transfer, Claim 2 would have been paid in full in accordance

---

7. The Stipulations also reference Notice of Change of Address (Doc. 92) filed by Nationstar on March 30, 2015, which changed Nationstar's address for account number 8739—the account number associated with the Debtors' Mortgage account in Claim 19. (*See* Stips. ¶¶ 4–5.) The Motion for Contempt in no way deals with Nationstar's account number 8739 or Claim 19.

8. The Court took judicial notice of the Notice of Withdrawal as Debtors' Exhibit 6.

9. The Trustee's letters were admitted into evidence as Debtors' Exhibits 10 and 12, respectively.

10. The Trustee's office had called Nationstar the prior day, on October 26, 2015, and left a voice message. (Stips. ¶ 4.) Mr. Hyne testified that the phone number the Trustee's office had called was set up by Nationstar exclusively for bankruptcy purposes.

with the Debtors' chapter 13 plan on February 27, 2015. (*Id.* ¶ 22.)

On May 7, 2015, Mr. Mocella drove the Car to Diane Sauer Chevrolet ("Dealership") and negotiated the purchase of a 2015 Chevrolet Colorado ("Truck"). The purchase of the Truck was to be financed through Ally Financial and included trade-in of the Car as part of the negotiated package. Mr. Mocella testified that, following these negotiations, he was excited about the new Truck and told his colleagues, friends, and family about the anticipated purchase, including showing them pictures of the Truck.

The terms of the Truck purchase were incorporated into Motion to Incur New Debt (Doc. 102), which was filed on May 8, 2015. The Court entered Order to Incur New Debt (Doc. 104) on May 11, 2015.

Mr. Mocella returned to the Dealership on May 11, 2015 with a copy of the Order to Incur New Debt to finalize the purchase and take possession of the Truck. When he arrived at the Dealership, Mr. Mocella learned, for the first time, that GMAC would not release title to the Car because GMAC had not been paid in full on Claim 2. Because the trade-in of the Car was a necessary part of the financing package, Mr. Mocella was not able to purchase the Truck.

Mr. Mocella said that he was embarrassed, upset, and deflated when he was informed that he did not have clear title to the Car because GMAC had not been paid in full. He also testified that he experienced physical symptoms for which he is required to take medications, including tightness in his chest, anxiety, and elevated blood pressure.

## II. STANDARD FOR REVIEW

The automatic stay in 11 U.S.C. § 362 is one of the basic protections a debtor receives upon filing a bankruptcy petition. Section 362(a)(3) provides:

(a) [A] petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of—

\* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]

11 U.S.C. § 362(a)(3) (2016). Subsection (k)(1) provides a remedy for violations of the automatic stay, as follows:

[ (k) ] (1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

§ 362(k)(1).[11]

The law is clear that a willful violation of the automatic stay arises if the creditor has knowledge of the debtor's bankruptcy and takes an intentional action that violates the stay.

In order to prevail on a § 362(k) claim, a plaintiff must prove by a preponderance of the evidence that the stay imposed under § 362 was violated, that the violation was committed willfully and that plaintiff was injured by the violation. *In re Skeen*, 248 B.R. 312, 316 (Bankr. E.D.Tenn.2000). *A willful violation occurs "when the creditor knew of the stay and violated the stay by an intentional act." TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 687 (6th Cir. BAP 1999). *It does not require proof of a specific intent to violate the stay. Id. Rather, it requires that the*

---

**11.** The exception set forth in § 362(k)(2) does not apply in this matter.

acts that violate the stay be intentional. *Lansdale Family Rest., Inc. v. Weis Food Serv. (In re Lansdale Family Rest., Inc.)*, 977 F.2d 826, 829 (3d Cir. 1992). *Skeen*, 248 B.R. at 317. *Indeed, "where the creditor received actual notice of the automatic stay, courts must presume that the violation was deliberate." Fleet Mortg. Group, Inc. v. Kaneh (In re Kaneh)*, 196 F.3d 265, 269 (1st Cir.1999).

*Grine v. Chambers (In re Grine)*, 439 B.R. 461, 466 (Bankr.N.D.Ohio 2010) (emphasis added).

### III. LEGAL ANALYSIS

#### A. Willful Violations of the Automatic Stay

■ There is no dispute that (i) the automatic stay applied in this case; (ii) Nationstar had actual knowledge of the Debtors' bankruptcy case; and (iii) Nationstar's filing of the Claim Transfer was an intentional act. Thus, the Court finds that the filing of the Claim Transfer was a willful violation of the automatic stay. The Court also finds that Nationstar's retention of the Claim Payments was an intentional act that constitutes a willful violation of the automatic stay because it was an act to exercise control over property of the estate.

■ "Withholding possession of property of the bankruptcy estate constitutes 'the exercise [of] control over property of the estate' for purposes of the automatic stay in 11 U.S.C. § 362(a)(3)." *TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 682 (6th Cir. BAP 1999). All of Nationstar's actions in filing the Claim Transfer, which resulted in receipt of the Claim Payments, and retaining the Claim Payments were "act[s] to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." § 362(a)(A)(3).

Nationstar argues that it did not act with "nefarious and malevolent intent" in filing the Claim Transfer or retaining the Claim Payments. (Resp. at 6.) Nationstar's intent, however, is immaterial to a finding of a willful violation of the automatic stay.

A specific intent to violate the stay is not required, or even an awareness by the creditor that her conduct violates the stay. It is sufficient that the creditor knows of the bankruptcy and engages in deliberate conduct that, it so happens, is a violation of the stay. Moreover, where there is actual notice of the bankruptcy it must be presumed that the violation was deliberate or intentional. Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages. *In re Daniels*, 206 B.R. 444, 445 (Bankr.E.D.Mich.1997) (internal citations and quotations omitted). "[G]ood faith is not a defense and is irrelevant to liability." *Id.* at 466.

*Tyson v. Hunt (In re Tyson)*, 450 B.R. 754, 766 (Bankr.W.D.Tenn.2011) (quoting *In re Printup*, 264 B.R. 169, 173 (Bankr. E.D.Tenn.2001)).

Thus, the Debtors have established all of the elements necessary for this Court to find—and this Court so finds—that Nationstar committed willful violations of the automatic stay when it (i) filed the Claim Transfer; and (ii) retained the Claim Payments.

#### B. Nationstar's Filing of the Claim Transfer Was Not Only Wrongful, It Was Not Reasonable

This case does not represent a garden-variety willful violation of the automatic stay. Most cases for willful violations of the automatic stay involve repossession of cars, dunning letters or calls to collect prepetition debts, garnishment of wages for

pre-petition debts, freezing of bank accounts, or similar kinds of conduct. In all of those kinds of cases, but for the automatic stay imposed by the bankruptcy filing, the creditor's actions would likely have been lawful. In this case, Nationstar had absolutely no right to or interest in the Claim Payments.

■ Even in situations where a creditor has some claim to the property that is wrongfully in its possession because of an automatic stay violation, it is imperative that the creditor immediately return such property. *See* 11 U.S.C. § 542 (2016). When a creditor wrongfully has possession of property of the bankruptcy estate, it is required to take affirmative action to return such property. A creditor does not have the right to retain property that is wrongfully in the creditor's possession until the debtor asks for its return. "A creditor who violates the automatic stay has an *affirmative duty to return the property and to restore the status quo* once it learns its actions violate the stay." *In re Clark,* 60 B.R. 13, 14 (Bankr.N.D.Ohio 1986) (emphasis added) (citing *In re Wariner,* 16 B.R. 216 (Bankr.N.D.Tex.1981)). "Once a creditor has been notified of the bankruptcy filing, *the creditor has a duty to restore the status quo; that is, the creditor should undo its postpetition collection activities* without the debtor having to seek affirmative relief from bankruptcy court." *Dubin v. Jakobowski (In re Stephen W. Grosse, P.C.),* 68 B.R. 847, 850 (Bankr.E.D.Pa.1987) (emphasis added) (citations omitted).[12]

■ Nationstar repeatedly emphasizes that the Trustee's two letters requesting the return of the Claim Payments were sent to an incorrect address. Nationstar further states that, after the Trustee's of-

fice called Nationstar and spoke to Mr. Daniels on October 27, 2015, Nationstar returned the Claim Payments to the Trustee within one week. Despite Nationstar's self-serving representation that it never received either of the Trustee's letters, neither of these two letters was returned as undeliverable. (Stips.¶ 20.) Moreover, Mr. Hyne testified that Nationstar had a forwarding directive with the United States Postal Service during this time period. Regardless, whether or not Nationstar received either of the Trustee's letters is irrelevant because Nationstar had an affirmative duty to return the Claim Payments without being asked to do so.

Nationstar asserts that it did not know that it had received the Claim Payments until the office of the Trustee's telephone call on October 27, 2015. The fact that Nationstar had misapplied the Claim Payments to the Debtors' Mortgage account and allegedly could not find them based on its own internal records does not excuse Nationstar's obligation to immediately return the Claim Payments. Indeed, if anything, Nationstar's inability to account for the Claim Payments exacerbates—rather than ameliorates—its conduct. Nationstar had an obligation to account for the Claim Payments it received from the Trustee as distributions on Claim 2. Nationstar is a sophisticated lender that, according to Mr. Hyne, has a phone line dedicated to the receipt of calls regarding bankruptcy matters and a department headed by Mr. Daniels to deal solely with bankruptcy matters. Yet, despite this focus on bankruptcy, Nationstar contends that it had no knowledge that it had received the Claim Payments. It is inexplicable that Nationstar had no idea that it had received the Claim Pay-

---

**12.** Unlike the facts before this Court where Nationstar had no entitlement to the Claim Payments, these cases involved post-petition collection of pre-petition debts where the creditors actually had claims for the amounts collected.

ments and did not know to what account those payments had been applied.

When it filed the Notice of Withdrawal, Nationstar acknowledged that the Claim Transfer had been filed without cause. Filing the Notice of Withdrawal required Nationstar to investigate whether it had received any payments for the wrongfully transferred Claim 2 so that such payments could be returned immediately to the Trustee. Mr. Hyne testified that Nationstar "made an assumption that there had been no payments that were needed to be returned" because no distributions had been posted to the HomeSaver Loan account (Hr'g Tr. at 70),[13] but Nationstar never contacted the Trustee—after acknowledging that the Claim Transfer had been filed without cause—to determine if the Trustee had made any distributions to Nationstar based on the Claim Transfer. Nationstar had an obligation to do so.

It is not disputed that GMAC never transferred Claim 2 to Nationstar. Nationstar's Claim Transfer was entirely based on a fiction. Mr. Hyne testified that Ocwen—an entity wholly unrelated to GMAC—made a bulk transfer of 11, 007 residential mortgage loans to Nationstar. One of the loans within this bulk transfer was the Debtors' HomeSaver Loan. Nationstar reviewed the bulk transfer to determine which loans involved current debtors in bankruptcy. Knowing that the Debtors had filed for bankruptcy protection, Nationstar reviewed the Debtors' claims register to see if Ocwen had filed a claim based on the HomeSaver Loan. As Nationstar freely acknowledges, Ocwen had not filed a proof of claim in the Debtors' bankruptcy case. According to Mr. Hyne, not finding a claim filed by Ocwen for the HomeSaver Loan raised a "red flag," which caused Nationstar to further

search the Debtors' claims register to see if GMAC Mortgage, as the originator of the Debtors' Note and Mortgage, had filed a proof of claim. However, because GMAC Mortgage had absolutely no connection to the HomeSaver Loan, Nationstar's search for a claim filed by GMAC Mortgage—or GMAC—was wholly irrational.

GMAC Mortgage had not filed a claim for the HomeSaver Loan, the Note and Mortgage, or for any other debt. Instead, Nationstar itself (i) had filed Claim 19 based on the Note and Mortgage originated by GMAC Mortgage; (ii) was the originator of the HomeSaver Loan; and (iii) had transferred servicing of the HomeSaver Loan to Ocwen.

Nothing in the record provides any explanation why, when searching for a proof of claim related to the HomeSaver Loan originated by Nationstar, Nationstar searched the Debtors' claims register for a proof of claim related to the Note and Mortgage originated by GMAC Mortgage (for which Nationstar itself had filed Claim 19). For some unexplained reason, after not finding a claim filed by Ocwen or a claim based on the HomeSaver Loan, Nationstar filed the Claim Transfer for Claim 2 filed by GMAC—an entity wholly independent of GMAC Mortgage, which had absolutely no relation to the HomeSaver Loan.

Mr. Hyne testified that 4s Technologies, as Nationstar's agent, actually conducted the search and prepared the Claim Transfer. Mr. Hyne explained the role of 4s Technologies as follows:

> 4s Technologies is a vendor that Nationstar uses for the purposes of when we have large bulk sale acquisitions, such as the Mocella loan was part of an

---

**13.** The Hearing transcript is available as a private document at Doc. 190. The Hearing transcript will be made publicly available on August 1, 2016.

acquisition of servicing rights from Ocwen Loan Services. So we utilize this firm to—to search the records of those loans that we're acquiring the servicing rights to to determine if those loans are in bankruptcy, and if they are in bankruptcy, have they had POCs filed and if it would be necessary to transfer those claims to Nationstar.

(*Id.* at 47.) The Claim Transfer was electronically signed by Megan Koza, Assistant Secretary for Nationstar, who did not review Claim 2 before signing the Claim Transfer.

> *Mr. Zuzolo*: And I believe you testified that Megan Koza did not review the Proof of Claim 2–1 before signing the transfer of the claim. Correct?
>
> *Mr. Hyne*: That's my understanding.
>
> *Mr. Zuzolo*: Because they're relying on whatever 4s puts in front of them, correct, with respect to Transfers of Claims?
>
> *Mr. Hyne*: Yes.

(*Id.* at 96.)

Mr. Hyne was only able to offer minimal testimony concerning the procedures of 4s Technologies related to the filing of the Claim Transfer.

> *The Court*: And is there a process where anyone at Nationstar reviews what 4s Technologies prepares regarding a claims transfer before it's filed?
>
> *Mr. Hyne*: Yes, ma'am, there is.
>
> *The Court*: And what is that process?
>
> *Mr. Hyne*: In this case because it was a bulk transfer, we had a bulk agreement to approve all the transfers at one time. So we gave them authority to just approve them all at once.
>
> *The Court*: So you gave who authority to approve all at once?
>
> *Mr. Hyne*: I'm sorry. Nationstar approves all the transfers all at one time.

> *The Court*: Is there any process whereby the original claim and the claim transfer are reviewed to see if the information matches up?
>
> *Mr. Hyne:* I'm not sure.
>
> * * *
>
> *The Court*: At that time did anyone go back and look at Claim 2 to see whether Claim 2 related to the Home Saver loan, since that was the basis for the error?
>
> *Mr. Hyne:* I'm not sure.

(*Id.* at 73–74.)

Upon questioning by the Court, Mr. Hyne conceded that 4s Technologies should have reviewed Claim 2 to determine if it related to a residential mortgage, since the bulk transfer related only to residential mortgages.

> *The Court*: I'm not asking if they're in bankruptcy. I just want to know as part of that whole bulk transfer, did they all relate to residential loans?
>
> *Mr. Hyne*: That's correct.
>
> *The Court*: So there was not a single claim that was transferred in the bulk transfer that related to a secured vehicle?
>
> *Mr. Hyne:* That's correct.
>
> * * *
>
> *The Court*: Would you expect 4s Technologies to review the claim to be transferred to see whether it related to any kind of security other than a mortgage loan?
>
> *Mr. Hyne*: I mean that—that would make sense.
>
> *The Court*: Should that have been part of their review?
>
> *Mr. Hyne*: Yes, ma'am.

(*Id.* at 104–05.)

In his testimony, Mr. Hyne referenced actions taken by 4s Technologies as actions taken by Nationstar. Even if Mr. Hyne had not characterized the actions of 4s

Technologies as Nationstar's actions, Nationstar would be liable for the actions of 4s Technologies regarding the Claim Transfer because Nationstar employed 4s Technologies as its agent.[14] In *Bankers Healthcare Group, Inc. v. Bilfield (In re Bilfield)*, 494 B.R. 292 (Bankr.N.D.Ohio 2013), the court found that Bankers Healthcare's service of process on the debtor was a willful violation of the automatic stay. The court held:

> Bankers Healthcare also hinted that it was the process server that violated the stay, not Bankers Healthcare. Again, this misses the point. Bankers Healthcare hired the process server and the process server was the agent of Bankers Healthcare; as such, Bankers Healthcare is responsible for the acts of its agent.

*Id.* at 305. There is no dispute that Nationstar is liable for all actions taken by its agent, 4s Technologies.

The following are obvious and significant differences between the information on Claim 2 and the HomeSaver Loan. On Claim 2, (i) the creditor is GMAC, (ii) the claim amount is $10,925.40; (iii) the annual interest rate is 10.75%; (iv) the claim is secured by the Car; and (v) the last four digits of the account number are 1280. (*See* Debtors' Ex. 1.) On the HomeSaver Loan, (i) the creditor is Nationstar; (ii) the loan amount is $3,027.86; (iii) the annual interest rate is 4.61%; (iv) the HomeSaver Loan relates to the Debtors' residence, although it is not secured by the Debtors' residence; and (v) the last four digits of the account number are 3016. (See Debtors' Ex. 3; Claim Transfer.) Despite these myriad differences, Nationstar consistently and repeatedly maintained that it was "reasonable" for Nationstar to file the Claim Transfer based only on the similari-

ty of GMAC to GMAC Mortgage. Yet, *whether or not their names are similar, neither GMAC nor GMAC Mortgage had any relation to the HomeSaver Loan.*

After acknowledging that all of the loans within the bulk transfer related only to residential mortgage loans, Mr. Hyne conceded that the person reviewing Claim No. 2 should have examined the proof of claim form to see what collateral was claimed as security. Despite not looking to see what kind of security was claimed or recognizing that every part of Claim 2 contained information different from the HomeSaver Loan, Nationstar continued to insist—throughout the evidentiary hearing and even in closing argument—that filing the Claim Transfer for Claim 2 was reasonable.

Nationstar's explanation concerning its failure to return the Claim Payments upon filing the Notice of Withdrawal on May 19, 2015 further demonstrates Nationstar's utter lack of adequate review in filing the Claim Transfer and the Notice of Withdrawal. Mr. Hyne offered the following explanation:

> *Mr. Zuzolo*: Do you think at a minimum Nationstar should have refunded the money at least as of May 19, 2015?
>
> *Mr. Hyne*: As of May 19 we weren't aware that we had received these payments.
>
> *Mr. Zuzolo*: Where had the payments gone?
>
> *Mr. Hyne*: We had reviewed the Home Saver Advance Loan, which is what these payments were supposed to be for—what was filed, the transfer of claim—and they had been posted to the Mocellas' primary mortgage account instead of the Home Saver Advance Account.

---

**14.** In response to the Court's question, "Is 4s Technology the agent of Nationstar for pur- poses of preparing claim transfers?", Mr. Hayne responded, "Yes." (Hr'g Tr. at 103.)

(Hr'g Tr. at 60–61.) Mr. Hyne further testified:

> *Mr. Campana*: And so when Nationstar withdrew the claim, how did it not realize that payments were received?
>
> *Mr. Hyne*: When we reviewed the Home Saver Advance account, those payments—*we didn't see any payments, so we made an assumption that there had been no payments that were needed to be returned.*
>
> *Mr. Campana*: So there was nothing with respect to the claim that was actually transferred, or attempted to be transferred, the Home Saver claim, that reflected payments were made at that time?
>
> *Mr. Hyne*: That's correct.

(*Id.* at 70–71 (emphasis added).) Again, Mr. Hyne explained Nationstar's failure to discover the Claim Payments:

> *Mr. Zuzolo*: Okay. So when you say you're assuming—I believe your testimony was, we just assumed that we hadn't gotten the payments. How— what's the basis for that statement.
>
> *Mr. Hyne*: The withdrawal of the claim related to the Home Saver Advance account. When we were preparing the withdrawal of the claim, we reviewed the Home Saver Advance history and there was no receipt of any funds coming into Nationstar. *And that was the—the limit of our review.*

(*Id.* at 71 (emphasis added).) Mr. Hyne's later testimony establishes that a more thorough search of Nationstar's own business records would have revealed that the Claim Payments had been improperly accounted for.

> *Mr. Zuzolo*: And you state that the money in—that was directed from GMAC to Nationstar was applied to the first mortgage. Is that correct?
>
> *Mr. Hyne:* Yes.

> *Mr. Zuzolo:* Okay. And how did you determine that?
>
> * * *
>
> *Mr. Hyne*: After the Trustee had provided us a listing of the entries of the payments, we again first looked at the Home Saver and saw that it wasn't there. *So then we searched for the other account for the first primary mortgage account, and we found it in the payment history.*

(*Id.* at 99 (emphasis added).)

The manner in which Nationstar determined that the Claim Transfer was improperly filed is also suspect.

> *The Court*: All right. The Notice of Withdrawal indicates that the claim transfer was filed in error. What was the error in Nationstar's opinion at the time the Notice of Withdrawal was filed?
>
> *Mr. Hyne*: When Nationstar set the Home Saver Advance account on its servicing system, it had coded it as a secured debt. We then subsequently realized that this was an unsecured loan, which we should not have filed the Transfer of Claim. And so that's what triggered us to file the withdrawal.

(*Id.* at 74.) Nationstar provides no explanation about what caused it to realize that the HomeSaver Loan was incorrectly "coded" as a secured debt. Nationstar's explanation for filing the Notice of Withdrawal further does not make sense because a claim does not have to be a secured claim in order to be the subject of a claim transfer; an unsecured claim can also be transferred. Regardless, at that time, Nationstar was aware that it had made errors in the Debtors' bankruptcy case, yet Nationstar chose to conduct essentially no investigation into the circumstances of the Claim Transfer.

The Court finds that there is no credible evidence that Nationstar's actions in filing

the Claim Transfer and retaining the Claim Payments were reasonable. Based on all of the evidence before the Court, the Court expressly finds that Nationstar's actions in filing the Claim Transfer and retaining the Claim Payments were not only wrongful—such actions were patently unreasonable. The most charitable characterization of Nationstar's conduct is that Nationstar acted wantonly, recklessly, without any regard for the interests of the Debtors or GMAC, and without any oversight of the process for filing the Claim Transfer. It is apparent that no one at or on behalf of Nationstar took even a cursory look at Claim 2. If anyone had glanced at Claim 2, let alone given it the examination required before filing the Claim Transfer, the obvious differences between Claim 2 and the HomeSaver Loan would have been apparent. In fact, Claim 2 and the HomeSaver Loan have absolutely no similarities. As a consequence, the Court can only conclude that Nationstar failed to (i) make any meaningful review of Claim 2 before filing the Claim Transfer; and (ii) make any meaningful investigation concerning receipt of the Claim Payments.

### C. Non–Attorney Fees Actual Damages

 Section 362(k)(1) provides that damages *shall* be awarded to a debtor if the debtor has been injured by a willful violation of the automatic stay.

The key to an award of damages under section 362(h) is not the willful violation of the automatic stay, but the resulting injury. Any person who suffers injury as the result of a willful violation of the automatic stay is entitled to recover actual damages.

*In re Perrin,* 361 B.R. 853, 856 (6th Cir. BAP 2007).[15]

Mr. Mocella testified that he works as a sales manager, a position that requires him to do a lot of driving. In order to perform his job, Mr. Mocella needed a vehicle that could carry passengers and product samples. In addition to the Car, the Debtors also listed a 2003 Chevrolet Blazer ("Blazer") valued at $2,775 on Schedule B. (Doc. 1 at 13.) Mr. Mocella testified that, for the past several years, he regularly drove the Blazer for work and his wife drove the Car. He decided to purchase the Truck in May 2015 because (i) the Blazer had accumulated 240,000 miles and was very unreliable; and (ii) he had made the last payment under the chapter 13 plan, so the Car would be paid in full and he could use it as a trade-in.[16] Mr. Mocella further testified that, because the Dealership was not offering any incentives at the time he negotiated the purchase of the Truck, the Dealership gave him a good deal on the trade-in value for the Car.

Mr. Mocella testified that (i) he drove between his home and the Dealership twice in anticipation of purchasing the Truck—on May 7, 2015 and May 11, 2015—and he incurred expenses for gasoline in the amount of "a few dollars" (Hr'g Tr. at 41); (ii) he had to take two half-days off work to go to the Dealership; (iii)

---

**15.** This case was based on a violation of the automatic stay that occurred prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005. As a consequence, the *Perrin* case references the applicable pre-BAPCPA Code section. Former § 362(h) is now § 362(k). The statutory language did not change with BAPCPA. Likewise, the Court's discussion of

*In re Bivens,* 324 B.R. 39 (Bankr.N.D.Ohio 2004), *infra* at pages 730–32, and *Baggs v. McClain Ford–Mercury, Inc. (In re Baggs),* 283 B.R. 726, 729 (C.D.Ill.2002), *infra* at page 730–31, is unaffected by former § 362(h) being codified at § 362(k).

**16.** But for the Claim Transfer, Claim 2 would have been paid in full on February 27, 2015. (Stips.¶ 22.)

between May 7 and May 11, he told his family, friends, and colleagues that he was getting the Truck and showed pictures of the Truck to them; (iv) when he was told on May 11 that he could not use the Car as a trade-in because GMAC had not been paid in full, he "hung [his] head" and was confused and upset (*id.* at 17); (v) he was embarrassed to see the people that he had previously told about the Truck purchase; (vi) he felt "deflated" for several days after May 11, although he was generally able to go about his normal day-to-day activities (*id.* at 31–32); (vii) after learning in October 2015 that Nationstar's actions in filing the Claim Transfer were the reason that he had not been able to purchase the Truck, he felt anxiety, tightness in his chest, and had an anxiety attack; and (viii) he now suffers from depression and high blood pressure, conditions for which he takes medication.

Mr. Mocella further stated that, after the Dealership informed him that the Car had not been paid in full and could not be used as a trade-in, he still needed to acquire another vehicle because the Blazer was inoperable. For a short period of time, Mr. Mocella drove the Car for work, but it broke down twice and required repairs. As a consequence, he purchased a 2007 Hummer H3 in the summer of 2015. Although never deprived of a vehicle, Mr. Mocella testified that he was deprived of a "reliable adequate vehicle for my travel that I do." (*Id.* at 25.) Mr. Mocella stated that, after being denied the ability to purchase the Truck on May 11, 2015, he did not call his attorney or ask Dealership personnel how much was still owed on the Car. He stated that he simply believed that he had been denied the opportunity to purchase the Truck because of his bankruptcy.

Nationstar argues that the Debtors do not have any damages in this case.

The damages claimed in the current [Motion for Contempt] are $297.72 and a night of frustration. One must immediately question why this issue was put in front of the Court as opposed to first calling Nationstar's counsel to seek a resolution. In fact, on the day the [Motion for Contempt] was filed, the Chapter 13 Trustee spoke with Nationstar directly and the funds were returned within one week. *The Mocellas' actual damage claims are now moot based on the return of such funds,* and any claims for attorney fees should be closely scrutinized based on the amount at issue and failure to mitigate damages before filing the [Motion for Contempt].

(Resp. at 1 (emphasis added).)

Return of the Claim Payments to the Trustee—approximately eleven months after Nationstar wrongfully filed the Claim Transfer—did not and does not "moot" the Debtors' damages any more than filing the Notice of Withdrawal undid the damage done by Nationstar when it filed the Claim Transfer. Despite Nationstar's characterization of the amount of the Debtors' damages as the total of the Claim Payments, at no time have the Debtors asserted that their damages are limited to $297.72. Nationstar's receipt and retention of the Claim Payments *caused* the Debtors' damages, but that amount is not necessarily indicative of the Debtors' damages.

With the exception of attorney fees, which the Court will address in Section III(D), *infra*, the Debtors' evidence of damages was largely conclusory rather than presented as specific quantifiable monetary damages. The Court finds that the only monetary damages (other than attorney fees) that the Debtors have quantified are Mr. Mocella's out of pocket costs for gasoline and usage of the Car in the amount of a "few dollars," which the Court estimates and finds to be $5.00. In addi-

tion to the Debtors'· costs of travel to and from the Dealership, the Debtors' economic damages were generally described as lost opportunities to purchase the Truck and obtain a favorable trade-in value for the Car in May 2015 [17] and loss of two half-days of work.[18] Because the Debtors did not attempt to quantify any of these damages and there is nothing otherwise in the record to support a monetary award, the Court finds that the Debtors failed to establish actual damages for the lost opportunities relating to the purchase of the Truck and the loss of work time.

Mr. Mocella also testified about his humiliation, embarrassment, and physical symptoms of tightness in his chest, anxiety, and high blood pressure. While the Court finds that Mr. Mocella did suffer emotional damages as a result of not being able to purchase the Truck on May 11, 2015, these emotional damages and ·lost opportunity costs are difficult to quantify.

This Court could undertake to estimate the amount of such damages, as the bankruptcy court did in *Varela v. Ocasio (In re Ocasio)*, 272 B.R. 815 (1st Cir. BAP 2002). In *Ocasio*, the debtor and his creditor Varela "ran into" each other in front of a third party's house. While the debtor was sitting in his car, Varela approached him and confronted him about how he was going to pay the debt owed to Varela. There was conflicting testimony about exactly what was said, but the debtor testified that eight or nine people in the vicinity overheard the exchange and that he was

embarrassed. He further stated that he feared for his physical safety. The bankruptcy court credited the debtor's testimony and concluded that, even if the statements had been made only in the presence of the debtor himself, the statements would be sufficient to constitute a violation of the automatic stay. On appeal, the Bankruptcy Appellate Panel for the First Circuit stated, "Although the bankruptcy court initially stated that there was no evidence of actual damages, it awarded the Debtor actual damages of $1,000, punitive damages of $9,000 and instructed to [sic] the Debtor's attorney to submit a fee application." *Id.* at 822. The Bankruptcy Appellate Panel analyzed the award of damages as follows:

> Varela also challenges the bankruptcy court's award of actual damages, citing that portion of the transcript where the court stated: "The evidence of actual damages has been none at all. But in this case, the Court is going to estimate that the damages in this case should be no less than ... [one] thousand dollars ($1,000) and attorney's fees...." While this statement might suggest an error in the award of actual damages, the record amply supports the award of actual damages because of the Debtor's testimony that he was embarrassed and felt threatened, as well as his wife's testimony that the Debtor was disturbed and had to seek medical treatment.

*Id.* at 824.

Here, Mr. Mocella stated that (i) he felt embarrassed; (ii) he was upset and deflat-

---

**17.** Although Mr. Mocella stated that the Dealership gave him a good deal on the trade-in value for the Car, he did not testify about the amount attributed by the Dealership for the trade-in value of the Car or how that amount would have compared to the actual trade-in value. The only evidence about the terms of the purchase are included in the Motion to Incur New Debt, which stated that the cost of the Truck was $32,774.00 at 5.44% interest,

with a payment of approximately $536.00 for 72 months.

**18.** Mr. Mocella failed to testify about how much he lost in wages as a result of having to lose two half-days of work. Although Mr. Mocella would have incurred quantifiable damages for the lost time, there is nothing in the record for the Court to make an award of actual damages.

ed; and (iii) he experienced anxiety, tightness in his chest, and high blood pressure. Unlike in *Ocasio,* however, Mr. Mocella was not physically threatened by Nationstar and he failed to provide evidence of a direct link between his physical symptoms and Nationstar's conduct.[19] As a consequence, the Court declines to estimate the Debtor's damages for emotional and physical distress under these circumstances.[20]

Accordingly, the Court finds that the Debtors have incurred actual, out-of-pocket compensatory damages in the amount of $5.00 for travel to and from the Dealership.

### D. Attorney Fees Actual Damages

Section 362(k) provides for actual damages, specifically including "attorneys' fees." 11 U.S.C. § 362(k). At the Hearing, Mr. Mocella testified that he had a fee agreement with Mr. Zuzolo that provided for a one-third contingency payment to Mr. Zuzolo and payment for hours of work performed at an hourly rate, as follows:

*Mr. Zuzolo* : So what is our agreement, Joe—or Mr. Mocella?

*Mr. Mocella* : That it was one-third of any damages or anything awarded and an hourly rate that I do not recall exactly what the rate was.

*Mr. Zuzolo* : Would it be an hourly rate as approved by the Court?

*Mr. Mocella* : Yes, whatever the hourly rate the Court was going to approve, yeah.

(Hr'g Tr. at 114.) Upon cross-examination, Mr. Mocella testified that he did not recall the exact hourly rate, but he believed that it was $200.00.

*Mr. Campana* : Mr. Mocella, can you give some details? What is the hourly rate that you're being charged?

*Mr. Mocella* : I think it was—if I'm trying to remember correctly—this was some time ago—that was $200 an hour, I thought.

(*Id.* at 114–15.)

The Court granted Mr. Zuzolo fourteen days to submit an itemized statement of his time and expenses to be considered as damages and granted Nationstar fourteen days to object or otherwise respond thereto.[21] The Court also permitted Nationstar to request a further hearing on attorney fees and expenses, but Nationstar made no such request. Mr. Zuzolo, on behalf of the Debtors, filed Debtors [sic] Supplement to Damages Regarding Attorneys [sic] Fees ("Fee Supplement") (Doc. 191) on May 12, 2016, and Nationstar filed Nationstar Mortgage LLC's Objection to Debtors' Supplement to Damages Regarding Attorneys' Fees ("Fee Objection") (Doc. 192) on May 26, 2016.

 In the Fee Supplement, the Debtors allege that they have incurred actual damages in the amount of $19,206.25 based on 73.2 hours of attorney and paralegal services. Of the requested fees, the Debtors represent that the following time was

---

**19.** The Debtor testified that his physical symptoms did not occur until October 2015 when he learned that Nationstar's actions had caused him to lose the opportunity to purchase the Truck.

**20.** Although the Sixth Circuit Court of Appeals has not addressed this issue, there is a split of authority among lower courts within the Sixth Circuit, as well as in other circuits, regarding whether damages based solely on

emotional distress may be awarded for a violation of the automatic stay. This Court assumes, without finding at this time, that non-economic damages are compensable under § 362(k).

**21.** The Court's usual practice regarding motions for contempt is to permit counsel for the debtor to submit a fee request and permit the opposing party an opportunity to object.

expended: (i) 46.7 hours by Mr. Zuzolo at $300.00 per hour; (ii) 2.0 hours by Patrick B. Duricy, Esq. at $250.00 per hour; (iii) a total of 22.35 hours by Ashley Hall, Esq. and Jason Rebraca, Esq. at $200.00 per hour; (iv) 1.7 hours of paralegal services at $100.00 per hour; and (v) 0.45 hours by Julianne Zuzolo–Edmundson, who is neither identified as an attorney nor a paralegal, at $125.00 per hour. Time charges begin on October 26, 2015 with a telephone call from Mr. Zuzolo's office to the Trustee's office and run through May 12, 2016. Time charges cover conferences with the Trustee's office and opposing counsel, preparation of the Motion for Contempt, legal research (done at $200.00 per hour with a reduction of the actual hours already taken in the Fee Supplement), meetings with the Debtors, activities associated with mediation that had been jointly requested by Nationstar and the Debtors,[22] trial preparation, and attendance at the Hearing.

Nationstar objects to the Fee Supplement on the following bases: (i) the Fee Supplement is insufficient because it "does not describe the compensation agreed to be paid by the Debtors" (Fee Obj. at 1); (ii) the Fee Supplement is not supported by affidavits or other documents; (iii) the Fee Supplement contradicts Mr. Mocella's testimony about the fee agreement; (iv) the fees are not reasonable; (v) the Debtors have not submitted evidence to support the fees claimed; and (vi) the Debtors failed to mitigate their damages.

It is usual and customary for attorney fees to be awarded as damages based on the submission of a fee statement. In *In re Bennett*, 135 B.R. 72 (Bankr.S.D.Ohio 1992), the bankruptcy court found that the creditor had willfully violated the automatic stay when it repossessed the debtors' car. The debtors requested specific lost wages and unspecified attorney fees. The bankruptcy court awarded damages for the lost income and "order[ed] Debtors' counsel to submit an itemization of fees and expenses incurred in prosecuting the Motion within ten (10) days of the date of entry of this order." *Id.* at 78. The creditor was provided seven days to respond, after which the court was to "determine the exact amount of fees and expenses to be awarded in a separate order, without an actual hearing, unless such a hearing [was] requested and deemed necessary." *Id.*; *see also Thomason v. Chestatee Cmty. Ass'n (In re Thomason)*, 493 B.R. 890, 902 (Bankr.N.D.Ga.2013) (citation omitted) ("[T]he Court should be presented with an adequate, itemized basis to analyze the amount sought as attorney's fees so that a determination can be made concerning their reasonableness and their relation to addressing the stay violations at issue."); *Copeland v. Kandi (In re Copeland)*, 441 B.R. 352 (Bankr.W.D.Wash.2010) (Court reviewed debtor's entire itemization of attorney fees and costs—including services relating to a state court action—to determine damages relating to the violation of the automatic stay); *Rosas v. Monroe Cnty. Tax Claim Bureau (In re Rosas)*, 323 B.R. 893, 902 (Bankr.M.D.Pa.2004) ("I am satisfied to award nominal damages of $1.00 in favor of each Plaintiff and against MCTCB. In doing so, I award attorneys' fees in advancing this litigation and direct Debtors' counsel to file an itemization of those fees within thirty days.").

---

**22.** On November 23, 2015, Nationstar and the Debtors jointly filed Stipulated Notice of Mediation (Doc. 163), which provided for private mediation of two matters: (i) the Motion for Contempt; and (ii) a second motion for contempt (Doc. 123) involving issues with the Debtors' Mortgage account. Mr. Zuzolo has charged only one-third of the time relating to the mediation to this Motion for Contempt, which appears reasonable to the Court.

The Court finds that the Fee Supplement adequately describes the services for which compensation is sought, the hourly rate for each service, and constitutes sufficient evidence for this Court to make an award of attorney fees as the Debtors' actual damages.

Although Nationstar contends that the Debtors have not submitted sufficient evidence to support their fee claim, the Court finds that the testimony of Mr. Mocella was sufficient to find that the Debtors had a fee agreement with Mr. Zuzolo. Even though Mr. Mocella did not have specific recall regarding the fee agreement, he testified that the Debtors did have an agreement to pay Mr. Zuzolo attorney fees in connection with the Motion for Contempt. The Court finds no contradiction between Mr. Mocella's testimony and the Fee Supplement since Mr. Mocella stated that the fee arrangement included an hourly fee agreement even though he was not certain of the hourly rate. The Court finds that the Fee Supplement adequately describes the compensation agreed upon in listing the hourly rate for each of the professionals that provided services in connection with the Motion for Contempt.

■ At the Hearing, Nationstar argued that the Debtors had no damages for attorney fees because they had not paid any compensation to Mr. Zuzolo or his firm. The Court finds that, even though they have not yet paid any attorney fees in connection with the Motion for Contempt, the Debtors would be obligated to pay fees invoiced by Mr. Zuzolo. The fact that the Debtors have a fee agreement with Mr. Zuzolo, which permits Mr. Zuzolo to bill the Debtors for his time and collect such fees in the future, is sufficient to support attorney fees as damages.

■ Indeed, a plaintiff is not required to incur out-of-pocket expenses in order to be awarded actual damages. All that is required for an award of damages is that such damages be real, substantial, and just. Nationstar has not cited and this Court's research has not found any case that denied or limited a debtor's damages for attorney fees related to a willful violation of the automatic stay on the basis that the debtor had not incurred out-of-pocket expenses by previously paying the attorney fees. In the present case, Mr. Mocella presented evidence of real, substantial, and just damages in the form of attorney fees because he is obligated to pay Mr. Zuzolo pursuant to their fee agreement.

■ In its Response, Nationstar argues that the Debtors are not entitled to any or are only entitled to limited attorney fees because the Debtors did not mitigate their damages by contacting Nationstar to request that Nationstar return the Claim Payments to the Trustee prior to filing the Motion for Contempt. Nationstar presented no evidence or reason to believe that the Debtors' attorney fees would have been less had the Debtors attempted to resolve this matter with Nationstar before filing the Motion for Contempt.[23] Moreover, there does not appear to be a factual basis for Nationstar's argument since the time entries in the Fee Supplement show that Mr. Zuzolo *did* contact opposing coun-

23. Nationstar's argument that the Debtors could have resolved this matter by simply having their attorney call Nationstar's attorney to seek return of the Claim Payments further misses the mark because the Debtors had suffered actual damages as a result of Nationstar's conduct months before they found out that such damages were the result of Nationstar's actions. The irony of Nationstar's argument is not lost on the Court since Nationstar was obligated to return the Claim Payments to the Trustee without being asked to do so, but Nationstar failed to contact the Trustee to determine if any distributions had been made to it on Claim 2 after the Claim Transfer was filed.

sel on October 26, 2015 prior to preparing the Motion for Contempt. There is no evidence that counsel for Nationstar was interested in resolving the issues regarding the Claim Transfer at that time.

In the Fee Objection, Nationstar argues that "the Debtors' unreasonably high settlement demands made settlement extremely difficult in this instance and warrant a denial or limitation on attorney fees." (Fee Obj. at 5 (citations, parentheticals, and n.2 omitted).) The facts in this case are unlike the facts in *Thomason v. Chestatee Community Association (In re Thomason )*, 493 B.R. 890 (Bankr.N.D.Ga. 2013), where the creditor argued that the debtor's attorney fees should be limited based upon allegedly high settlement demands. The *Thomason* court held, "Here, extensive litigation was unnecessary since the letter was already retracted and use of the pool restored through issuance of a new swipe card. Counsel also introduced statements from settlement negotiations in support of the argument that Debtor's claim for damages was wildly over-estimated, and that any award of attorney's fees should be reduced accordingly." *Id.* at 902 (citations and n.16 omitted). In the present case, Nationstar cannot credibly argue that extensive litigation was not necessary since it continuously asserted that its conduct in filing the Claim Transfer was reasonable and that the Debtors had incurred no damages. Considering Nationstar's outrageous position at the Hearing that· the Debtors had no damages because the Debtors "received full credit" for the Claim Payments since they had been credited to the Debtors' unrelated Mortgage account (Hr'g Tr. at 86), this Court does not believe that the failure of the parties to settle this matter was solely based on al-

legedly unreasonable settlement expectations on the part of the Debtors.[24]

The Court takes judicial notice of other matters in the Debtors' bankruptcy case involving Nationstar. Although Nationstar characterizes the Debtors as having a "litigious nature" (Resp. at 4), it is clear to the Court that the amount of attorney time and effort involved in the disputes between these parties is not based only on the alleged litigious nature of the Debtors. In addition to the "error" Nationstar asserts occurred in filing the Claim Transfer, Nationstar has, admittedly, made other mistakes involving these Debtors, one of which culminated in Stipulated Order Regarding Nationstar Mortgage LLC's Motion for Relief from Stay (First Mortgage) ("Stipulated Order") (Doc. 159) entered on November 5, 2015. The Stipulated Order details Nationstar's failure to properly track a loan modification that should have been finalized and instituted with the Debtors effective four years earlier in December 2011.

The Debtors had no obligation under the Bankruptcy Code to contact Nationstar before filing the Motion for Contempt. Section 362 specifically contemplates that a debtor may seek redress for a willful violation of the stay; nothing requires a debtor to first attempt other measures before litigation. Most significantly, at the end of the Hearing, Nationstar continued to assert that it had acted reasonably in filing the Claim Transfer and that the Debtors had no damages as a result thereof. Based on Nationstar's entrenched and inflexible position on this issue, the Court finds that requiring the Debtors to contact Nationstar to attempt to resolve this issue before filing the Motion for Contempt would have been a useless act.

---

24. In the Fee Objection, Nationstar offers to provide evidence regarding settlement discussions (Fee Obj. at 5 n.2), but Nationstar never requested a further hearing on the issue of attorney fees.

Attorney fees may be awarded for a violation of the automatic stay even when there are nominal or no other actual damages. In *Grine v. Chambers (In re Grine)*, 439 B.R. 461 (Bankr.N.D.Ohio 2010), the bankruptcy court found that the debtors were entitled to compensatory damages in the amount of $565.00. The facts in *Grine* involved only one post-petition attempt by a doctor to collect a debt for pre-petition services rendered to the debtor–husband. After discussion with the debtors' counsel that such conduct constituted a violation of the automatic stay, the doctor sent the debtors' counsel a check for $200.00 with a notation in the memo line that the payment was "Extortion Money." Based on this notation, the check was returned to the doctor with notice that, if settlement was not reached, a lawsuit would be filed. The debtors' counsel waited three weeks and then filed an adversary proceeding. The debtors alleged damages in the amount of twelve hours of lost work time for the debtor-wife at the rate of $7.65 per hour, gasoline for several visits to their counsel's office in the amount of $5.00, and attorney fees in the amount of $1,972.00 (based on 7.8 hours at $250.00 per hour). The court held that the debtor-wife had not incurred any damages for lost work time because the doctor's willful violation of the stay was directed only to her husband's account, but that the $5.00 for travel to counsel's office was a compensable damages claim. Based on this small compensatory damages claim, the bankruptcy court looked to whether attorney fees would also constitute compensable damages for the violation of the automatic stay.

*This court is persuaded by those courts holding that attorneys' fees may be awarded under § 362(k) even if no other amounts are awarded as actual damages. Other bankruptcy courts in the Sixth Circuit have generally adopted this position. See [Harris v. Memorial Hosp. (In re Harris)*], 374 B.R. [611,] 616 [ (Bankr.N.D.Ohio 2007) ]; *In re Skeen*, 248 B.R. [312,] 322 n. 5 [ (Bankr.E.D.Tenn.2000) ]; *Cousins v. CitiFinancial Mortg. Co. (In re Cousins)*, 404 B.R. 281, 290 and n. 9 (Bankr. S.D.Ohio 2009). *The words of § 362(k), with actual damages "including" attorneys' fees, compels this result, as do the general policy considerations underpinning the statute described above. Debtors may still be injured by a violation of the automatic stay without being able to translate that injury into money.*

*Id.* at 471–72 (emphasis added).

The bankruptcy court then analyzed the amount of the attorney fees requested and determined that, "[n]otwithstanding the absence of the word 'reasonable' in § 362(k), *cf.* 11 U.S.C. § 303(i)(1)(B), courts making fee awards under this section apply a reasonableness standard." *Id.* at 472 (citation and parenthetical omitted). The bankruptcy court then utilized the "lodestar" method of fee calculation and reduced the attorney fees to $560.00. The court reached this result by taking judicial notice of the hourly rates charged by attorneys representing debtors in consumer bankruptcy cases in that court, which, at that time, generally ranged from $125.00 to $225.00 per hour, and determining that an hourly rate of $200.00 was reasonable. The court then looked at the circumstances of the case and determined that a total of 2.8 hours was reasonable for the work done by the debtors' attorney.[25]

---

**25.** In *Grines*, counsel for the debtors had filed a similar complaint and sent the same form demand letter to a different creditor for a violation of the automatic stay. Based on these earlier similar pleadings and documents, the bankruptcy court determined that the hours necessary for the stay violation should be reduced.

■ This Court will utilize the lodestar method to determine the reasonableness of the attorney fees requested as the Debtors' damages. Nationstar asserts that the Court should evaluate whether $300.00 per hour for consumer bankruptcy lawyers in Youngstown is reasonable because bankruptcy lawyers in "the Toledo area—an area similar to Youngstown—generally charge between $125 to $225 per hour." (Fee Obj. at 4 (citing *In re Grine*, 439 B.R. at 474).) Nationstar makes this statement based on Judge Whipple's finding in *Grine* that the hourly rates for consumer bankruptcy cases in Toledo in 2010 were $125.00 to $225.00. *In re Grine*, 439 B.R. at 474. This Court first notes the passage of nearly six years' time since Judge Whipple made the determination of hourly rates in *Grine*. The Court also notes that the Toledo and Youngstown bankruptcy communities are not particularly similar when it comes to consumer cases. The work necessary in chapter 13 cases is usually more involved than chapter 7 cases and, thus, the rates charged by consumer lawyers may be different. The cases filed in the Toledo court location are heavily weighted toward chapter 7 cases rather than chapter 13 cases. Indeed, although the Toledo court location covers 21 counties and has 2 bankruptcy judges compared to Youngstown's 4 counties and 1 bankruptcy judge, the Toledo court has approximately 60% of the number of chapter 13 cases that Youngstown has.

■ Furthermore, the Court takes judicial notice that other consumer bankruptcy attorneys who regularly practice before this Court charge between $200.00 and $300.00 per hour. The Court also takes judicial notice that the hourly rates for Nationstar's counsel far exceed the hourly rates requested by Mr. Zuzolo and other members of his firm. In the Notice of Hourly Rate Changes of Thompson Hine, LLP filed on February 10, 2016 in a chapter 7 case pending in this Court,[26] Mr. Campana's hourly rate is listed as $435.00 and an associate with the same years of experience as Mr. Zuzolo is billed at $315.00 per hour.[27] Indeed, Thompson Hine charges $240.00 per hour for paralegal services, which is 80% of the hourly rate charged by Mr. Zuzolo.[28]

■ As a consequence, the Court has evaluated the $300.00 rate charged by Mr. Zuzolo and the lower hourly rates charged by other attorneys in his firm and finds that these hourly rates are reasonable and fall within the range of fees charged by attorneys in this area who practice consumer bankruptcy before this Court. The Court further finds that the time spent in this matter was reasonable and necessary, which time covers (i) investigation and drafting pleadings; (ii) discovery; (iii) mediation, which had been jointly requested by the parties; (iv) legal research; and (v) preparation for and attendance at the Hearing. The Court finds that all of these services are compensable except: (i) $56.25 attributed to neither attorney nor paralegal services; and (ii) $1,400.00 (7.0 hours at $200.00 per hour) for Mr. Rebraca to attend the Hearing with Mr. Zuzolo. Accordingly, applying the lodestar method, the Court finds that reasonable attorney fees relating to the Motion for Contempt are $17,750.00 ($19,206.25 less $56.25 less $1,400.00).

**26.** *In re D & L Energy, Inc.*, Case No. 13–40813, Doc. 1571.

**27.** Admitted to practice in Ohio in 2007.

**28.** *See In re D & L Energy, Inc.*, Case No. 13–40813, Doc. 1527, First Interim Application of Thompson Hine LLP for Interim Allowance of Compensation for Professional Services Rendered and Reimbursement of Expenses, at 6.

For the reasons set forth above, the Court finds that the Debtors have incurred actual damages in the amount of $17,750.00 as attorney fees.

### E. Punitive Damages Are Appropriate in this Case

■ Section 362(k) provides that an award of punitive damages may be made in appropriate circumstances. *See* 11 U.S.C. § 362(k). At the close of the Hearing, Mr. Zuzolo, on behalf of the Debtors, requested that this Court award punitive damages in the amount of at least $100.00 per day from December 4, 2014 (the date Nationstar filed the Claim Transfer) through November 6, 2015 (the date the Trustee received funds in the amount of the Claim Payments).

In the present case, Nationstar's conduct in filing the Claim Transfer was based entirely on the fiction that GMAC had transferred Claim 2 to Nationstar; however, GMAC had done no such thing. Although Nationstar repeatedly stated that it did not act with malicious intent toward the Debtors when it filed the false Claim Transfer, the kindest characterization of Nationstar's conduct in filing the Claim Transfer is reckless indifference;[29] even a cursory review of Claim 2 would have revealed that the claim did not in any way relate to the HomeSaver Loan. Nationstar's motive in filing the Claim Transfer based on the alleged similarity between GMAC and GMAC Mortgage is suspect because *Nationstar*—not GMAC Mortgage—*originated the HomeSaver Loan. GMAC Mortgage*—like GMAC—*had no relationship whatsoever with the HomeSaver Loan.*

Nationstar has never apologized or even acknowledged that its actions in filing the false Claim Transfer damaged the Debtors or adversely affected the administration of the Debtors' bankruptcy estate. In fact, Nationstar not only insists that it acted reasonably in filing the Claim Transfer, Nationstar went so far as to make the incredible assertion that the Debtors had no damages based on Nationstar's wrongful conduct because the Claim Payments were (for a time) mistakenly credited to the Debtors' Mortgage account. Needless to say, Nationstar provided no explanation how the misapplication of the Claim Payments in any way could or did benefit the Debtors. However, this bald assertion demonstrates Nationstar's unabashed arrogance—exemplifying Nationstar's attitude that anything it characterizes as "incorrect" or a mere "error" should be overlooked and excused without regard to Nationstar's lack of care or oversight in fulfilling its duties and obligations.

■ The primary purpose of punitive damages is to change the behavior of the offending party. *In re Pawlowicz*, 337 B.R. 640, 648 (Bankr.N.D.Ohio 2005) (citing *In re Riddick*, 231 B.R. 265, 269 (Bankr.N.D.Ohio 1999)) ("When applied to a stay violation, the primary purpose of an award of punitive damages becomes that which is sufficient to cause a change in the creditor's behavior.")

■ Punitive damages may be awarded even where actual harm is not compensable.

Punitive damages and attorney fees may be awarded under Section 362(h),

---

**29.** In affirming the denial of a debtor's discharge based on a false affidavit regarding the debtor's interest in and value of a corporation, the Second Circuit Court of Appeals stated, *"[R]eckless indifference to the truth, which is the kindest attitude that can be taken toward Diorio's affidavit, is the equivalent of fraud." Diorio v. Kreisler–Borg Constr. Co. (In re Diorio)*, 407 F.2d 1330, 1331 (2d Cir. 1969) (emphasis added).

even where the actual harm suffered is not compensable. *Patton v. Shade*, 263 B.R. 861 (C.D.Ill.2001). The primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the creditor's behavior; the prospect of such change is relevant to the amount of punitive damages to be awarded. *In re Riddick*, 231 B.R. 265, 269 (Bankr. N.D.Ohio 1999); *see, also, In re Novak*, 223 B.R. 363 (Bankr.M.D.Fla.1997) (bankruptcy court gauges punitive damage award based on gravity of creditor's offense, and sets award at levels sufficient to insure that it will punish and deter.) The factors to be considered for an award of punitive damages for a willful violation of the automatic stay include the following: the nature of the creditor's conduct, the nature and extent of harm to the debtor, the creditor's ability to pay damages, the level of sophistication of the creditor, the creditor's motives, and any provocation by the debtor. *In re Flack*, 239 B.R. 155, 163 (Bankr.S.D.Ohio 1999); *In re Klein*, 226 B.R. 542, 545 (Bankr.D.N.J.1998); *In re Wills*, 226 B.R. 369, 376 n. 8 (Bankr.E.D.Va.1998).

*Baggs v. McClain Ford–Mercury, Inc. (In re Baggs)*, 283 B.R. 726, 729 (C.D.Ill.2002).

Moreover, punitive damages may be awarded even when the creditor has undertaken to correct its violation of the automatic stay. In *In re Bivens*, 324 B.R. 39 (Bankr.N.D.Ohio 2004), the bankruptcy court imposed punitive damages of $1,000.00 on the creditor for it violation of the automatic stay, despite the creditor's remedial efforts. The creditor erroneously advised the insurance company that issued the policy for the debtor's residence that the debtor had vacated the premises, which triggered cancellation of the policy. Upon being advised that the debtor continued to reside at the property, the creditor took immediate steps to alert the insurer and rectify the error. The court held:

> For purposes of § 362(h), an award of punitive damages is not conditioned upon the existence of a finding of any actual damages. All the same, the imposition of punitive damage is not an action to be taken lightly, and in this regard, this Court has always exercised great restraint in making such an award. Generally speaking then, cases in which punitive damages have been awarded involve conduct that is egregious, vindictive or intentionally malicious.

> In the instant matter, Fifth Third Bank's conduct cannot be said to rise to such a high level of culpability; of importance, once confronted with its transgression, Fifth Third Bank took immediate steps to rectify the situation. *Still, by § 362(h)'s use of the words "appropriate circumstance," as opposed to any reference to the transgressor's state of mind, a high level of culpable intent is not necessarily a prerequisite to an award of punitive damages.* To hold otherwise, besides running counter to the plain-meaning approach repeatedly applied by the Supreme Court of the United States when interpreting the Bankruptcy Code, would also run counter to the purpose underlying the existence of punitive damages in general: to deter similar conduct in the future. Therefore, *even in the* absence of any overt wrongful intent, this Court will *follow the rule, as has been applied by other courts, that an award of punitive damages may still be appropriate for a violation of the automatic stay when there is a strong showing that the creditor acted in bad faith or otherwise undertook their actions in reckless disregard of the law.*

*Id.* at 42–43 (internal citations, parentheticals, and n.1 omitted) (emphasis added). The bankruptcy court considered the following factors in imposing punitive damages: (i) the nature of the creditor's conduct; (ii) the nature and extent of harm to the debtor; (iii) the creditor's ability to pay damages; (iv) the level of sophistication of the creditor; (v) the creditor's motive; and (vi) any provocation by the debtor. *Accord, Weary v. Poteat,* 627 Fed. Appx. 475, 477 (6th Cir.2015) ("The bankruptcy court considered various factors, including Weary's sophistication, ability to pay, and demeanor, which the court characterized as reflecting open defiance of the stay.")

Here, Nationstar is a sophisticated mortgage lender that has the ability to pay a punitive damages award.[30] The Debtors, by contrast, did nothing wrong and took no action to provoke Nationstar's conduct. Even without an improper motive, the Court finds that this is an appropriate case for an award of punitive damages. Nationstar (i) filed the Claim Transfer without regard to the fact that it was not the transferee of Claim 2 or any other claim in the Debtors' bankruptcy case; and (ii) had absolutely no interest in Claim 2 or entitlement to the Claim Payments. Even more egregious is Nationstar's insistence that, although it made a "mistake" in filing the Claim Transfer, its conduct was entirely reasonable. Nationstar has taken no steps to change its policies or procedures to ensure that this kind of "mistake" does not happen in the future. Indeed, despite being familiar with Nationstar's policies and procedures, Mr. Hyne testified that he was not aware that Nationstar would take any

different action today in making bankruptcy claim transfers relating to bulk transfers of loans.[31]

In the present case, the Court has already determined that, at best, Nationstar acted with reckless indifference and disregard for whether it had any right to file the Claim Transfer.

> [P]unitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes. Such awards are "reserved ... for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief. To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so.

*Wagner v. Ivory (In re Wagner),* 74 B.R. 898, 903 (Bankr.E.D.Pa.1987) (internal citations omitted). As such, Nationstar's conduct warrants imposition of punitive damages.

Based on the egregious conduct of Nationstar and Nationstar's total lack of understanding that what it did was wholly unreasonable, the Court can think of no more appropriate case than this one for an award of punitive damages. The Sixth Circuit Court of Appeals has determined that, if actual damages are not sufficient to deter future bad conduct, punitive damages may be awarded in an amount that is sufficient to do so. "If the bankruptcy court believes that the amount of such actual damages is insufficient to deter the kind of deliberate and repeated violations

---

**30.** For the year ended December 31, 2015, the "Net income attributable to Nationstar" disclosed on Nationstar Mortgage Holdings Inc.'s Consolidated Statements of Operations and Comprehensive Income was $38,779,000.00. Nationstar Mortg. 2015 Annual Report at 69, available at http://investors.nationstarholdings.com/file/4288863/Index?KeyFile=1500083864

**31.** *See* page 54, *infra.*

of the automatic stay which are evident in this case, the bankruptcy court is free to impose an appropriate amount of punitive damages. We leave that to the bankruptcy court's discretion." *Archer v. Macomb Cnty. Bank,* 853 F.2d 497, 500 (6th Cir. 1988).

The Court has considered awarding punitive damages in the amount of $100.00 for each of the 337 days between the filing of the Claim Transfer on December 4, 2014 and the return of the Claim Payments on November 6, 2015—for a total of $33,700.00. However, based upon Nationstar's self-righteous attitude regarding its wrongful conduct, the Court does not believe that $33,700.00 is sufficient to deter Nationstar in making future "mistakes" of this kind. Indeed, Nationstar has not presented evidence that it intends to change its policies and continues to assert that its conduct was reasonable, making future mistakes of this kind not only possible, but likely.

Mr. Hyne had the following response upon being questioned by Mr. Zuzolo:

Mr. Zuzolo: Okay. You've testified that the reason the two claims got linked together was because the promissory note for the attachment to Claim Number—or the Exhibit Number 2 [Claim 19 filed by Nationstar] had GMAC Mortgage Corporation as the originator. Is that correct?

*Mr Hyne*: Yes.

Mr. Zuzolo: So you believe it's reasonable that GMAC and GMAC Mortgage Corporation was enough to link the two claims together?

*Mr. Hyne:* Yes.

\* \* \*

Mr. Zuzolo: Looking at Proof of Claim—or Exhibit Number 1 [Claim 2 filed by GMAC], this is—this the front page of the—of the document. This is

not an exhibit for the note or anything. Do you see number 4, where it says, "motor vehicle?"

*Mr. Hyne*: Yes.

Mr. Zuzolo: And you see where it's described and there's a VIN number listed?

*Mr. Hyne:* Yes.

Mr. Zuzolo: And your position is still that it was reasonable to link these two claims together.

*Mr. Hyne*: Yes. By the names of the entities, yes.

\* \* \*

Mr. Zuzolo: I'm sorry. But your—my understanding of your testimony is that because the attachment to Claim Number—or Exhibit Number 2 [Claim 19 filed by Nationstar] had the original lender as being GMAC Mortgage Corporation, that was enough—that was reasonable enough to link the Home Saver loan, which has nothing to do with GMAC, to the GMAC secured car loan. Correct?

*Mr. Hyne:* That's correct.

(Hr'g. Tr. at 96–98.) Mr. Hyne similarly answered Mr. Campana's question on the matter.

Mr. Campana: And do you believe it was reasonable to confuse the GMAC auto loan claim with the fact that Nationstar had a lender on its Proof of Claim with the name of GMAC?

*Mr. Hyne*: Yes.

(*Id.* at 102.) Even more troubling, Mr. Hyne testified that the entire circumstances of this case are reasonable and that he is unaware of any plans by Nationstar to change its policies and procedures.

Mr. Zuzolo: So you believe—what you've testified to is that you believe that was has happened in this case was

reasonable under the circumstances. Is that correct?

*Mr. Hyne*: Yes.

*Mr. Zuzolo*: So as you sit here today, Nationstar has no intention of changing its process that you've talked about?

* * *

*Mr. Hyne*: To answer your questions, I haven't been involved in any discussions with management regarding a change in process. Whether or not that may result from this hearing, I don't know. But I haven't been involved in those discussions.

(*Id.* at 102–03.)

The penalty for filing a false statement on a claim transfer is $500,000.00. The Court recognizes that the element of fraud appears to be absent in Nationstar's filing of the Claim Transfer, thus the criminal penalty for filing a false claim is not applicable here. However, the amount of this penalty does inform the Court regarding the seriousness of filing a false claim transfer. Here, Nationstar's conduct was, at best, recklessly indifferent. Nationstar is remorseless and has taken no action to changes its conduct in the future. It is troubling to the Court that Nationstar continues to insist it acted reasonably in filing the false Claim Transfer. Accordingly, this Court finds that $250,000.00—one half of the amount of the criminal penalty—is an appropriate award of punitive damages in this case. The award of punitive damages in the amount of $250,000.00 in the present case is not enough to constitute a financial threat to Nationstar, but hopefully is sufficient to deter future conduct of this sort by Nationstar.

As a consequence, the Court will grant the Motion for Contempt and award punitive damages in the amount of $250,000.00, in addition to actual damages in the amount of $17,755.00, for a total damages award in the amount of $267,755.00 to the Debtors.

An appropriate order will follow.

IT IS SO ORDERED.

## ORDER (i) GRANTING DEBTORS' MOTION FOR CONTEMPT AGAINST NATIONSTAR; AND (ii) AWARDING ACTUAL AND PUNITIVE DAMAGES

Before the Court is Motion for Contempt Against Nationstar Mortgage, LLC ("Motion for Contempt") (Doc. 147) filed by Debtors Joseph J. Mocella and Kimberly A. Mocella on October 27, 2015. On February 25, 2016, Nationstar Mortgage LLC ("Nationstar") filed Nationstar Mortgage LLC's Objection to the Debtors' Motion for Contempt (Doc. 170). On April 27, 2016, the parties filed Proposed Stipulations of Nationstar Mortgage LLC and the Debtors with Respect to the Debtors' Motion for Contempt (Doc. 187).

The Court held an evidentiary hearing on the Motion for Contempt on April 28, 2016 ("Hearing"). The Debtors were represented by Philip D. Zuzolo, Esq. and Nationstar was represented by Jeremy M. Campana, Esq. The Court received testimony from (i) Mr. Mocella; and (ii) Edward Hyne, Litigation Resolution Analyst for Nationstar. Admitted into evidence, without objection, were Debtors' Exhibits 1, 3, 4, 5, 9, 10, 11, 12, and 13 and Nationstar's Exhibit B. The Court took judicial notice of Debtors' Exhibits 2 and 6.

At the beginning of the Hearing, the parties stipulated to the following facts: (i) the automatic stay in 11 U.S.C. § 362 was in place on December 4, 2014; (ii) Nationstar had actual notice of the Debtors' bankruptcy case since at least June 25, 2010 when Nationstar filed its first Request for Service of Notice (Doc. 16); and (iii) Nationstar's filing of the Claim Transfer was an intentional act.

For the reasons set forth in the Court's Memorandum Opinion Regarding Debtors' Motion for Contempt Against Nationstar entered on this date, the Court hereby:

1. Finds that Nationstar committed willful violations of the automatic stay in 11 U.S.C. § 362(a)(3) when it (i) filed the Claim Transfer; and (ii) retained the Claim Payments.

2. Finds that Nationstar's wrongful filing of the Claim Transfer and retention of the Claim Payments were not reasonable.

3. Finds that the Debtors incurred actual, out-of-pocket compensatory damages in the amount of $5.00.

4. Finds that the Debtors incurred actual damages in the amount of $17,750.00 as attorney fees.

5. Finds that the attorney fees in the amount of $17,750.00 relating to the Motion for Contempt were necessary and reasonable.

6. Awards the Debtors actual damages in the amount of $17,755.00 pursuant to 11 U.S.C. § 362(k)(1).

7. Finds that appropriate circumstances exist to award punitive damages pursuant to 11 U.S.C. § 362(k)(1).

8. Awards the Debtors punitive damages in the amount of $250,000.00 pursuant to 11 U.S.C. § 362(k)(1).

The Court hereby grants the Motion for Contempt and enters judgment against Nationstar in favor of the Debtors in the amount of $267,755.00.